SHIVERS, Judge.
Robert O. Pohl, M.D., individually, and Robert O. Pohl, P.A., a professional corporation, appeal final judgment awarding malpractice damages to Dr. Pohl’s patient, Allen W. Witcher. Appellee Witcher cross-appeals the trial court’s deduction from his award of amount received by appellee from his insurer.
At issue is whether the trial court erred in denying Dr. Pohl’s motion for directed verdict on the basis there was insufficient proof of proximate causation to make out a prima facie case of medical negligence. At issue on the cross-appeal is whether section 768.50, Florida Statutes, prohibits reduction of Witcher’s award by the sum Witch-er received from his insurer. We reverse the judgment on appeal and remand. This moots the issue on cross-appeal.
Allen Witcher injured his left ankle sliding into second base while playing softball. He was treated at the Jacksonville Memorial Hospital emergency room where X-rays were taken. The next day he took the hospital X-rays with him to Dr. Pohl, an orthopedic surgeon. The doctor interpreted the X-rays to reveal an old fracture, but no acute or fresh break. He treated the ankle initially with a compression wrap to control the swelling and then placed the ankle in a non-weight bearing case. The doctor diagnosed Witcher’s injury as a liga-mentous sprain and treated Witcher from May 13, 1978, to July 10, 1978. The doctor took no additional X-rays, relying on those obtained at the emergency room. From the outset and during the doctor’s treatment periods, Witcher continued to experience pain and swelling. After a short walking leg cast was applied, Witcher was advised to begin walking with support of the cast.
Three weeks later, the second east was removed, and Witcher was advised to begin exercising and continue bearing weight upon his left ankle and walking upon it as he could. During the course of treatment by Dr. Pohl, Witcher continued to express concern about the pain, discomfort, swelling and general appearance and deformity of his left ankle and foot. He was advised by appellant Pohl that this was normal and not to be concerned. Eventually, because of his concern over the continued pain, swelling and deformity of his ankle and his inability to bear much weight upon the left ankle, Witcher sought opinions from other orthopedic surgeons in Jacksonville. He did not return for his scheduled appointment with Dr. Pohl in August.
On October 5, 1978, Witcher saw Dr. Hocker, another orthopedic surgeon in Jacksonville, for a second opinion. Dr. Hocker took additional X-rays which revealed a fracture of the head of the talus (the bone of the ankle which articulates with the bones of the leg). Dr. Hocker prescribed a leather brace or, failing that, surgery. Witcher then sought the opinion of another Jacksonville orthopedic surgeon, Dr. Scharf, who recommended surgery after viewing the hospital X-rays as well as Dr. Hocker’s X-rays. On November 3, 1978, Witcher began seeing Dr. Binski, an orthopedic surgeon in Jacksonville who, like Drs. Scharf and Hocker, had difficulty visualizing the fracture on the hospital emergency room X-rays. After taking additional X-rays and tomograms, Dr. Binski concluded that Dr. Pohl had misdiagnosed the injury. Dr. Binski performed surgery in an attempt to salvage the joint without the necessity for fusion but found the salvage procedure could not be done. During the same surgery, Dr. Binski performed a triple arthodesis fusing the three surfaces of the talonavicular joint in Witcher’s left ankle to stabilize the joint, alleviate the *1017 pain and permit some use of his left foot. After the surgery Witcher experiences a deformity and lack of motion which Dr. Binski rated as a 30% medical impairment to the left lower extremity.
Drs. Hocker and Scharf testified that Dr. Pohl’s treatment was within the standard of care for orthopedic surgeons.
Dr. Binski testified, entirely by depositions, that Dr. Pohl’s treatment of Mr. Witcher deviated from the appropriate standard of care for orthopedic surgeons.
Q “Based upon your examination of Allen Witcher, the history he presented, your physical examination of him and his foot and your review of the care and treatment given to him by Dr. Robert Pohl, the Defendant in this case, together with Dr. Pohl’s file and notes, the records which you were able to obtain about him, that is Dr. Pohl’s treatment of Mr. Witcher, the x-rays of Memorial Hospital taken on or about May 5, 1978, which we have been discussing here today, and your training, education and experience and within reasonable medical probability, do you have an opinion if there was a deviation from the standard of care required of orthopedic surgeons by Dr. Pohl in the care and treatment of Allen Witcher?
A “Yes, I do.
Q “Could you state that for us, please, sir?
A “I reviewed Dr. Pohl’s office notes here about the patient’s injury and apparently with reference to the first time he saw him after he was referred from the emergency room at Memorial Hospital. Apparently he was seen the following day. The letter was dated May 12 and I assume that is the day he saw him in his office and Dr. Pohl had written a letter to Dr. Carriere I believe it is, who was the patient’s physician or referring physician indicating that he had sustained an injury to his ankle playing softball and that he was seen at the hospital and x-rays were taken which as he wrote in his letter, which appeared to be an old avulsion fracture of the navicular with possibly an old talar neck fracture and again, also some bony flecks adjacent to the medial malleolus were present. The second paragraph indicates his examination which in summary indicated there was a large amount of soft tissue swelling around the entire ankle and there was also a lot of tenderness present also but there was no exact indication of where that tenderness was present and the remaining was more or less a treatment that he instituted. I feel that Dr. Pohl should have obtained additional x-rays knowing that there was a previous abnormality present on the x-rays which were obtained from Memorial Hospital to better ascertain what that was.
Q “And by not doing that there was a deviation from the standard of care?
A “Yes.”
The first two depositions of Dr. Binski were taken while he was still in Jacksonville, the third one after Dr. Binski had moved to Ohio.
At the close of Witcher’s case, Dr. Pohl moved for a directed verdict on the basis Witcher had failed to present a prima facie case that Dr. Pohl had deviated from the accepted standard of care and further that there was causation by Dr. Pohl for Witch-er’s injuries. The trial court denied the motion. At the close of all the evidence Dr. Pohl renewed his motion for directed verdict which the trial court denied. The jury returned a verdict for appellee Witch-er, and judgment followed. Dr. Pohl moved the court to set aside the verdict and enter judgment in accordance with his earlier motion for directed verdict and for new trial. After argument and review of Dr. Binski’s deposition testimony, the court entered its final judgment in accordance with the verdict of $145,000, but deducting therefrom the $3,693.04 which Witcher received from collateral sources.
To prevail in a medical malpractice case a plaintiff must establish the following: the standard of care owed by the defendant, the defendant’s breach of the standard of care, and that said breach proximately caused the damages claimed. *1018 Gooding v. University Hospital Building, Inc., 445 So.2d 1015 (Fla.1984).
We are concerned with whether appellee Witcher has met his burden of introducing evidence which affords a reasonable basis for the conclusion that the injury more likely than not resulted from the defendant’s negligence and established a jury question of proximate cause. See Gooding v. University Hospital Building, supra, and Beisel v. Lazenby, 444 So.2d 953 (Fla.1984).
There is no argument that Dr. Pohl owed a duty to his patient, Mr. Witcher. Although Drs. Hocker and Scharf testified otherwise, Dr. Binski’s opinion that Dr. Pohl deviated from the accepted standard of care provided sufficient basis to submit that question to the jury.
As to whether Dr. Pohl’s negligence caused Mr. Witcher’s injury, Dr. Binski deposed, in one of his Jacksonville depositions:
Q “All right. Now, in the discharge summary for the hospitalization, I noted you reported there was loss of good articular surface of the head of the talus. What do you mean by that, and of what significance did that have to you?
A “Well, one of the reasons why any type of reconstruction of the injury was impossible was the secondary changes that had occurred to the articular surface. Then, again, this results as a consequence of abnormal or no function in the joint. So, it’s related both to the injury, and it’s related, both to the time period afterwards.
Q “Can you in any manner tell me the degrees to which it’s related to each?
A “Well, generally an injury to the articular surface, if not corrected within about 72 hours, will produce significant changes in articular cartilage. So, the aim of any joint injury is to treat it as quickly as possible to get the optimum result.
Q “Okay. And what type of corrective measures are you referring to within the 72-hour period?
A “Reduction of the fracture and relocation of the joint anatomically and holding it with some sort of internal device or implant such as a screw or pin of some sort to maintain that position.”
On April 22, 1981, Dr. Pohl’s attorney again took Dr. Binski’s deposition, and this time Dr. Binski testified in part:
A “Well, the statement is there, there is no question about that. I assume it was misdiagnosed because the diagnosis of a fracture dislocation at that area was made, it would have meant that surgical treatment was indicated.
Q “All right.
A “This wasn’t done.
A [Sic] “So if I understand you, perhaps you can explain it to me better because I want to be sure it is clear. You are saying that because surgery was not done, there was not a diagnosis of the injury correctly?
A “That’s correct.”
MR. WALKER: Turning to Page 71, Line 6.
Q “From the injury itself or from the way it was diagnosed and treated is really my question.
A “Well, I can’t say what the result would have been even with adequate treatment of the injury or surgical treatment to realign the bone. You could still end up with certain stiffness and degenerative changes. I’d have to say it is a result of the injury.
Q “Would it have resulted in those— in the degree in which it eventually did result?
A “I don’t know.
Q “You don’t know the answer to that one?
“Doctor, in the first part of this deposition when you were responding to Mr. Saalfield’s questions and we got to basically the same point that we are in this report, that is the resultant, what his condition was when he came to you and is now. You were asked by Mr. Saalfield if this condition is one that frequently results from the type history that he presented to you as to the cause of the *1019 injury, that was his question. And your answer was that the injury he sustained left untreated, I would assume, would end up with a similar type of problem. Now, that’s getting back to my question a moment ago. Are you saying or did you say then that, did you mean then or are you saying now that as a result of the fact that the — or, as a result of the injury, the dislocation, the fracture not being treated surgically shortly after it occurred, that Mr. Witcher ended up where he is now?
A “Well—
Q “And I’m—
A “The injury he had, untreated, I would have expected it to end up with the problems that he presented with. Properly treated, I’m not sure what the final outcome would be. It certainly could be just as bad, hopefully it would be better.
Q “Doctor, based upon your training and experience if treated, and by that I take it that it would have been the surgical treatment which you recommended and I believe Dr. Hocker and Dr. Scharf, although they disagreed about what they found, also recommended. Isn’t it correct, sir, that within a reasonable medical probability that it would have ended up significantly better?
A “Well, I would expect that there would have been a better result with the surgical treatment.
Q “Okay, sir. Is it possible, and this is what I think that you are having some difficulty with and I can appreciate that, it is possible to differentiate between the result that would have been achieved that way and the result that has been achieved now?
A “I don’t think that we can.”
Here, Dr. Binski appears to be saying that, although he expects that Mr. Witcher would have had a better result with proper treatment, it is not possible to differentiate between the result that would have been achieved if Mr. Witcher had been properly treated by Dr. Pohl and the result that has been achieved by Dr. Binski’s surgery. Dr. Binski, however, testified at another deposition:
A “I wrote a medical report, I believe, to you, February of 1979 which went over my examination and history taking of the patient and my subsequent treatment and what I felt happened to the patient and I indicated as a matter of summary that the patient had sustained an intra-articular shear fracture of the head and neck of the left talus with associated dislocation of the talus and rotational malalignment on the subtalar joint. This was the result of a sudden eversion and pronation injury of the foot while he was sliding into a base playing baseball. The original injury itself was misdiagnosed and the patient was treated for a ligamentous sprain of the ankle and foot. The result was chronic deformity and stiffness of the left foot, with mal-union of the fracture site and persistent dislocation of the talus and rotational locking of the subtalar joint. The chronic pain led to decreased mobility and eventual stiffness in the ankle, secondary to posterior soft tissue cont-racture, especially of the gastroc nemius soleus muscle and Achilles tendon.”
Here, Dr. Binski’s testimony appears to express a direct causal relationship between the deviation from the standard of care by Dr. Pohl and the result which occurred.
The trial court did not err in failing to direct a verdict for Dr. Pohl. Although the record contains competent substantial evidence to the contrary, the record also contains competent substantial evidence that Dr. Pohl, in his treatment of Mr. Witcher, deviated from the standard of care required of orthopedic surgeons. There is also competent substantial evidence in the record from which the jury could find that as a result of Dr. Pohl’s negligence, Mr. Witcher endured pain and suffering from the time proper treatment by Dr. Pohl of Mr. Witcher should have begun until Dr. Binski’s triple arthrodesis operation, for which pain and suffering Mr. Witcher is entitled to compensatory damages.
*1020 We find that the jury, by its verdict, concluded that Dr. Pohl in his treatment of Mr. Witcher departed from the standard of care required for orthopedic surgeons. We determine that this, then, has been established.
We find, though, that there is ambiguity or contradiction in Dr. Binski’s testimonies as to whether there is a direct causal relationship between Dr. Pohl’s deviation from the standard of care required for orthopedic surgeons in his treatment of Mr. Witcher and the present condition of Mr. Witcher’s ankle. The jury has never been given the opportunity to resolve the extent of the present condition attributable to Dr. Pohl's negligence. Without a proper resolution of this issue, Dr. Pohl may well have been unjustly held responsible for damages contrary to law. We therefore reverse and vacate the damage award, and remand for a new trial only on damages.
REVERSED and REMANDED.
BOOTH, C.J., concurs.
ZEHMER, J., concurs in part and dissents in part with written opinion.